# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
Telephone: (212) 545-4000
Facsimile: (212) 972-3213
Attorneys of Record:
      Clifford R. Atlas (CA 9512)
      Matthew A. Steinberg (MS 3979)

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

--------------------------------------------------------

RICHARD FRATERRIGO,

            Plaintiff,

        -against-                 06-CV-9861 (SHS) (MHD)

AKAL SECURITY, INC.,

            Defendant.

--------------------------------------------------------

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of this Court, Defendant AKAL Security, Inc. (referred to herein as "AKAL" or "Defendant"), by and through its undersigned counsel Jackson Lewis LLP, respectfully submits the following Statement Of Undisputed Material Facts In Support Of Defendant's Motion For Summary Judgment:

## I.    SUMMARY OF PLAINTIFF'S COMPLAINT

      1.    In this action, Plaintiff Richard Fraterrigo (referred to herein as "Plaintiff" or "Fraterrigo") alleges that Defendant AKAL unlawfully terminated his employment as a Court Security Officer (referred to herein as "CSO") because of his alleged actual and/or perceived

disability (relating to his hearing) in violation of the Americans with Disabilities Act, 42 U.S.C. §1211 et seq. (the "ADA") (First Cause of Action), the New York Executive Law, Section 290 et seq. (the "NYSHRL") (Second Cause of Action) and the New York City Administrative Code Section 8-107 (the "NYCHRL") (Third Cause of Action).  A true and correct copy of Plaintiff's Complaint is attached as Exhibit "A" to the accompanying Affidavit Of Clifford R. Atlas, Esq. In Support Of Defendant's Motion For Summary Judgment (referred to herein as the "Atlas Aff").[1]

2.       On December 14, 2007, Plaintiff voluntarily withdrew the Fourth and Fifth Causes of Action set forth in his Complaint which alleged age discrimination.  (See Ex. "B").

3.       On August 23, 2007, all written discovery in this matter closed.

4.       On December 5, 2007, all expert discovery in this matter closed.

5.       Accordingly, the instant motion for summary judgment is ripe for the Court's consideration.

## II.      BACKGROUND FACTS REGARDING THE PARTIES AND REGARDING PLAINTIFF'S EMPLOYMENT WITH AKAL.

6.       In carrying out its statutory obligation "to provide for the security of the United States District Courts, the United States Courts of Appeals, and the Court of International Trade" under 28 U.S.C. § 566(a), the USMS contracts with private companies, such as Defendant AKAL, to supply CSO's at federal courthouses.  (See id.; see also 28 U.S.C. § 604(a)(22).

---

[1]       Exhibits to the Atlas Aff. are referred to herein as "Ex. __."

7.     In that capacity, from on or about October 1, 1998 through on or about June 3, 2004, AKAL employed Plaintiff as a CSO principally in the New York federal courthouse located at 40 Foley Square.  (See Ex. "A," ¶ 1).

8.     In 1934, the City of New York ceded to the federal government the land on which the 40 Foley Square courthouse (where Plaintiff worked) is situated.  (See Ex. "C").[2]

9.     For approximately fourteen (14) years prior to October 1998, Plaintiff worked as a CSO, in the same courthouse, for other security vendors.  (See Ex. "A," ¶ 1).

10.     In October 1998, however, when the United States Marshal Service (the "USMS") awarded AKAL the security contract for the Second Judicial Circuit, Plaintiff became an employee of AKAL.  (See id.).

11.     Throughout the course of Plaintiff's employment with AKAL, AKAL was a party to a Collective Bargaining Agreement which provided, inter alia, that AKAL does not discriminate against any employee on the basis of "disability . . . or other protected reason."[3] (See Ex. "D"; see also Pl. Tr., pp. 25-26).

12.     As a CSO for AKAL from October 1998 to June 2004, Plaintiff's job encompassed all aspects of securing the 40 Foley Street courthouse including: (1) monitoring jurors; (2) working in courtrooms; (3) maintaining the entrance and exits points in the courthouse; (4) monitoring cameras; (5) monitoring the outside of the courtroom; (6) patrolling each and every occupied and unoccupied room in the courthouse; (7) responding to

---

[2]     This undisputed fact is relevant to Defendant's contention that Plaintiff's NYSHRL and NYCHRL are barred by the "federal enclave doctrine," which generally precludes enforcement of state and local anti-discrimination laws with respect to "federal enclaves" (i.e., federal courthouses), unless such laws were promulgated prior to the date on which the enclave was ceded to the federal government.  See Point III of Defendant's accompanying Memorandum of Law.
[3]     References to the transcript of Plaintiff's June 14, 2007 deposition testimony are attached as Exhibit "E" to the Atlas Aff. and will be referred to herein as "Pl. Tr., p. ___."

emergencies; and (8) restraining individuals.[4]  (See Pl. Tr. pp. 26-32; Gunn Tr., p. 49; see also Paragraph "33," infra).

13.     During his deposition, Plaintiff testified that it was "important" as "part of [his] job as a [CSO]" to "be able to hear . . . and [to] localize sounds."  (See Pl. Tr., p. 32).

14.     Moreover, Defendant's Vice President of Human Resources, Janet Gunn, confirmed that hearing was an important part of the CSO job function insofar as CSOs must be able to hear "soft sounds" such as (a) the click of a weapon, or (b) an alarm in a far off part of the building.  (See Gunn Tr., p. 49).

15.     Although the parties dispute whether Plaintiff suffers from a "disability" as defined by the ADA, the NYSHRL or the NYCHRL, it is undisputed that Plaintiff suffers from some degree of hearing loss.  (See Ex. "A," ¶ 19; see also Exhibits "O" - "Q" and "U," infra).

16.     At his deposition, however, Plaintiff testified that: (1) his hearing loss "has not impacted his day-to-day life in any way;" (2) he has never been treated for hearing loss;" (3) he has "never worn a hearing aid;" (4) he "does not feel he has to wear a hearing aid;" (5) that no one "has ever suggested to [Plaintiff] that [he] wear a hearing aid;" and (6) that he "does not feel [he] has a hearing problem at all."  (See Pl. Tr., pp 8 – 9, 115 – 116) (emphasis added).

17.     As fully explained in Point III infra, throughout the course of Plaintiff's employment with AKAL, Plaintiff's employment as a CSO was governed by the terms and conditions set forth in AKAL's contract with the USMS for the Second Judicial Circuit (the "USMS Contract"). (See Ex. "G").

---

[4]     References to the transcript of the July 30, 2007 deposition testimony of Defendant's Vice President of Human Resources, Janet Gunn are attached as Exhibit "F" to the Atlas Aff. and will be referred to herein a "Gunn Tr., p. ___."

18.     The USMS Contract sets minimum hearing standards for all CSOs.  (See id.)

19.     Consequently, each year, the USMS requires AKAL CSOs to undergo hearing examinations to confirm that their hearing meets the USMS hearing standards. (See id.).

20.     In June 2004, the USMS determined, for the first time, that Plaintiff failed to meet the USMS hearing standards.  (See Point V, infra)

21.     Accordingly, the USMS disqualified Plaintiff from serving in the capacity of CSO.  (See id.).

22.     Because AKAL did not have any alternate employment positions for which Plaintiff was not disqualified, in June 2004, Plaintiff was constrained to terminate Plaintiff's employment.  (See id.; see also Gunn Tr. pp 45 – 47).

## III.     UNDISPUTED MATERIAL FACTS REGARDING THE USMS CONTRACT AND REGARDING THE USMS HEARING STANDARDS.

### A.     The USMS Hearing Standards Were Developed Based Upon A Comprehensive Study Of CSOs' Essential Job Functions.

23.     The Director of the Administrative Office of the U.S. Courts ("AOUSC"), under the direction and supervision of the Judicial Conference, "[r]eceives and expands, either directly or by transfer to the [USMS] or other Government agency, funds appropriated for the procurement, installation and maintenance of security equipment and protective services for the United States Courts and courtrooms and adjacent areas . . . "  (See 28 U.S.C. § 604(a)(22)).

24.     The Judicial Conference's Committee on security and facilities (referred to herein as the "Judicial Conference Committee") recommends security policies to the full Judicial Conference, including policies regarding the CSO program. (See Ex. "H," at ¶ 1-2).

25.     Until a few years ago, CSOs were evaluated for medical conditions using a Civil Service Commission form that had been developed in the late 1960s.  (See, e.g., Plaintiff's 1999 and 2000 medical review forms attached as Ex. "N," infra).

26.     This form could be filled out by a CSO's private physician, who was unlikely to be familiar with the particular job requirements of the position.  (See id.).

27.     Beginning in 1997, a number of federal judges became concerned that some CSOs were not physically capable of responding to security threats and other strenuous emergency situations.  (See Ex. "H," ¶ 4).

28.     The judges on the Judicial Conference Committee had always been concerned about the security at federal courthouses, but their concerns took on new significance following the 1995 bombing of the Oklahoma City federal building. (See id.).

29.     Based upon these concerns, the Judicial Conference Committee, working with the USMS, arranged for the United States Public Health Service's office of Federal Occupational Health (referred to herein as "FOH") to conduct a job-task analysis of the CSO position. (See id., ¶ 5).

30.     Dr. Richard J. Miller, who was then the Director of Law Enforcement Medical Programs with FOH, conducted the study and developed the USMS' current audiological standards.   (See id., ¶ 5; see also Ex. "I").

31.     The purpose of the study was to identify the essential functions of the CSO position and to recommend whether any changes needed to be made to the CSO medical standards or procedures. (See Ex. "H," ¶ 5; Ex. "I," ¶ 6).

32.     *The Final Report: Medical Requirements for Court Security Officers* (February, 2000) prepared by the Federal Occupational Health Law Enforcement Medical

Program, summarizes Dr. Miller's study and describes the steps taken to promulgate these standards (the "Report").  (See Ex. "J").

33.    The introductory section of the Report explains:

[CSOs] supplement the mission of the [USMS] by providing security for U.S. federal courthouses, their property and employees . . . Recent years have seen increased security threats to U.S. federal buildings, U.S. courthouses and federal judiciary.  The federal judiciary system of the U.S. is the foundation of American freedom, and security threats to the federal courthouse or the federal judiciary are a threat to our national security.  Therefore, these threats must be taken extremely seriously.  Security threats to the sanctity of the federal court range from threats to the safety of the federal judge to distractions in the courtroom during trial that can cause misconduct or trial . . . [CSOs] must [therefore] be capable of providing both a deterrence to potential threats and a timely and appropriate response to actual threats. The primary functions of the CSO include physical security for the federal courthouse and perimeter, checkpoint security for the courthouse and courthouse entry points, courtroom monitoring, and a rapid response to emergencies and alarms within the courthouse.

(See id., p. 5).

34.    As set forth in the Report, recommendations for the medical requirements of the CSO position (including hearing standards) were based on an exhaustive analysis of data regarding: (1) the occupational requirements of the CSO position; (2) risk profiles; (3) narrative information collected from focus group participants, judges, U.S. Marshals, Deputy U.S. Marshals, and CSOs; and (4) enforcement occupational medicine reference manuals and expert consultants.  (See id., p. 6).

35.    Dr. Miller identified twenty one (21) essential job functions for the CSO position.  The following essential job functions related to hearing:

- Comprehend speech during face-to-face conversations;

- Comprehend speech during telephone conversations;

- Comprehend speech during radio transmissions;

- Comprehend speech when you cannot see another CSO;

- Hear sounds that require investigation; and

- Determine location of sounds.

(See id.).

36.     In this regard, the Report states that:

> Essential job functions are essential to the performance of the CSO job. A CSO who is unable to perform an essential job function is likely to disrupt the flow of required work and directly threaten the health and safety of themselves and others. The essential job functions, as determined by the incumbent CSO in the functional job analysis, become the bona fide occupational requirements for the job. Essential job functions take into account both the actual function and the environment in which the function is performed.

(See id., p. 10).

37.     Once Dr. Miller determined CSOs' essential job functions, he ascertained the actual physical and safety risks of performing these functions, i.e., a risk profile. (See id., p. 8).

38.     If Dr. Miller concluded that a medical requirement was necessary to ensure CSOs can perform an essential job function, he utilized the risk profile to determine the precise level of the medical requirement. (See id., p. 9).

39.     Importantly, in determining the precise level of the medical requirement, Dr. Miller compared the CSO risk profile with the risk profile of other law enforcement occupations. (See id., p. 8).

40.    After consideration of the Report, the Judicial Conference Committee concluded that "Dr. Miller had satisfactorily determined the essential functions of the CSO position and that the standards recommended would accurately assess the ability of the CSO to perform those functions." (See Ex. "H," ¶ 6).

41.    Accordingly, in 2000, the Judicial Conference Committee adopted the conclusions of Dr. Miller's study and directed the USMS to implement a number of changes to the CSO medical standards and procedures based upon Dr. Miller's recommendations.  (See id.; see also FN 5, supra).

**B.    Relevant Provisions Of The USMS Hearing Standards**

42.    In pertinent part, the USMS Contract adopted by the Judicial Conference of the United States provides as follows:

> The medical condition of the CSO workforce is critical to the overall safety of the judiciary.  To ensure that each CSO is medically qualified to perform in a CSO capacity, all prospective contract CSO employees must undergo and pass the required USMS pre-employment medical examination.  In addition, all contract CSO employees must undergo and pass an annual reexamination during the life of the [USMS] [C]ontract . . . failure to meet any one of the required medical and/or physical qualifications will disqualify any employee for appointment or continuation under the [USMS] [C]ontract.

(See Ex. "G," § C-8(e)) (emphasis added).

43.    With respect to hearing qualifications, the USMS Contract provides as follows:

> The [CSO] must be able to hear well enough to safely and efficiently carry out the essential functions of the job.  This requires satisfactory binaural hearing (ability to hear in each ear), and ability to:  localize sounds, comprehend speech, and hear sounds that require investigation or that alert to danger.

(See Ex. "J," § C-8(e)(2)).

     44.    In order to ensure that each AKAL CSO possesses the requisite hearing to perform the CSO position, the USMS Contract requires the annual administration of carefully-circumscribed hearing examinations.  Specifically, the USMS Contract mandates:

- Initially, all CSOs are tested UNAIDED using a pure tone, air conduction audiogram (audiometer) for measurement, testing each ear separately (referred to herein as "Step Number 1").  In order to pass this UNAIDED pure tone hearing examination, the CSO's pure tone audiometric deficit, without the use of hearing aids, must not (a) for the frequency range of 500-2000 hertz (Hz), exceed 30 decibels (dB) in either ear; (b) for the frequency range of 3000 Hz, exceed 40 dB in either ear; or (c) for the frequency range of 4000 Hz, exceed 50 dB in either ear;

- If the above UNAIDED pure audiogram is passed and the CSO does not wear hearing aids on the job, no further testing is needed and the CSO is deemed medically qualified under this hearing standard;

- If the above UNAIDED pure audiogram is failed and the CSO does not wear hearing aids on the job, the CSO must undergo UNAIDED functional hearing assessments (referred to herein as "Step Number 2").  In order to pass such functional hearing assessments, and therefore remain medically-qualified to hold a CSO position, the CSO's (a) unaided haring loss between the two ears must not differ by .25 dB or more at three or four speech frequencies, i.e., 500, 1000, 2000 and 3000 Hz; (b) unaided Speech Reception Threshold must be 30 dB or better in at least one ear; (c) unaided Speech Recognition in quiet must be 90% or above in each ear; and (d) unaided Speech Recognition in a noise sound field must be 50% or above;

- If the above UNAIDED pure audiogram is failed, and the CSO wears hearing aids, the CSO must undergo both UNAIDED and AIDED functional hearing assessments; and

> - If the above UNAIDED pure audiogram is failed, and the CSO wears hearing aids, the CSO must undergo both UNAIDED and AIDED functional hearing assessments.

(See Exhibit "G," § C-8(e)(2)) (emphasis added).

### C.    The USMS Contract Does Not Preclude CSOs Who Can Meet The Hearing Standards Unaided From Wearing Hearing Aids On The Job.

45.    As set forth in Point III(A), supra, Dr. Miller concluded, after an exhaustive study, that CSOs must be able to meet the USMS hearing standards unaided in order to satisfactorily perform the essential CSO job functions.

46.    Dr. Miller further concluded that the use of hearing aids by a CSO who could not meet the USMS hearing standards unaided was problematic in several material respects.  (See id., ¶¶ 19 – 29).

47.    First, hearing aids do not restore those with hearing loss to normal hearing. (See id., ¶ 25).

48.    Second, hearing aids improve hearing the least under the most difficult listening situations (increased background noise) where hearing impaired individuals need the greatest enhancement and where CSOs face the most critical and safety-sensitive situations.. (See id., ¶ 25).

49.    Third, hearing aids are mechanical devices and, as such, are subject to unexpected loss, malfunction and breakage.  (See id., ¶ 25).

50.    Fourth, batteries may die unexpectedly and hearing aids may be dislodged in physical confrontations.  (See id., ¶ 25).

51.    CSOs who cannot pass the USMS hearing standards unaided have hearing which, without their hearing aids, is impaired and less than those who can pass the hearing exam unaided.  (See id., ¶ 27).

52.     When a hearing aid is not working for the CSO wearing it, his or her ability to hear is less than it would be if his or her hearing aid was functioning.  (See id., ¶ 25).

53.     If a CSO's hearing aid malfunctioned on the job, he would have to rely on his residual hearing.  (See id., ¶ 27).

54.     Pursuant to Dr. Miller's study, for CSOs who could not meet the USMS hearing standards aided, such residual hearing may not be adequate to hear threats made or instructions issued during an emergency.  (See id., ¶ 27).

55.     Significantly, if a threat were made or an instruction were issued during an emergency and a CSO (whose hearing aid was dislodged or malfunctioned and whose residual hearing could not meet the USMS hearing standards) did not hear the threat or instruction, a life may be lost.  (See id.).

56.     To the contrary, if a CSO who passed the USMS hearing standards unaided and who wore a hearing aid experienced any type of hearing aid malfunction, his hearing impairment would generally not be as great as the CSO who could not meet the hearing standards unaided.  (See id.).

57.     For these and other reasons, Dr. Miller determined, and the Judicial Conference Committee accepted, that CSOs must pass the USMS hearing standards without the use of hearing aids.  (See id., 25-27).

58.     Significantly, the USMS Contract does not per se prohibit CSOs from wearing hearing aids on the job to enhance their hearing provided that they can meet the USMS hearing standards unaided.  (See id.).

59.   In June 2002, the United States Department of Justice issued a memorandum to AKAL (and to its other outside security contractors) which highlighted the specific importance of hearing standards (the "DOJ Memo").  (See Ex. "K").

60.   The DOJ Memo states that "[CSOs'] lives, those of their co-workers and the public may actually depend on their ability to hear, localize, discriminate, recognize and/or understand a variety of environmental and speech sounds."  (See id.).

61.   The DOJ Memo summarized the federal government's concerns regarding CSOs' use of hearing aids in order to meet the USMS hearing standards.  (See id., Bates No. D0199).

62.   Additionally, the expert witness Plaintiff proffered in this case, Dr. Patricia Chute, confirmed: (1) audiologists do not guarantee to patients that hearing aids restore hearing; (2) the federal Food & Drug Administration requires that a specific disclaimer appear on all hearing aids dispensed in the United States stating hearing aids do not restore normal hearing; (3) hearing aids require the use of batteries, which can electronically or mechanically malfunction or completely lose power – often times without any advance notice; (4) hearing aids can be dislodged in a physical confrontation; and (5) ear wax in an individual's ear canal can also block the hearing aid's loudspeaker output.[5]   (See Chute Tr., pp. 86, 106).  Dr. Chute also testified that when a patient begins to use a hearing aid, it is like "learning a new language."  (See id., p. 20).

63.   Finally, Defendant's audiological expert in this case, Dr. Marc B. Kramer, who has extensive experience in the field of law enforcement audiological standards, concluded that CSOs should be required to meet the USMS hearing standards unaided.  (See Ex. "L").

---

[5]      References to the transcript of the November 5, 2007 deposition testimony of Plaintiff's expert witness, Dr. Patricia Chute, are attached as Exhibit "M" to the Atlas Aff. and will be referred to herein as "Chute Tr., p. ___."

**IV.** **FOR EACH YEAR OF PLAINTIFF'S EMPLOYMENT WITH AKAL PRIOR TO 2003, PLAINTIFF MET THE USMS HEARING STANDARDS AND PLAINTIFF DID NOT EXPERIENCE ANY PURPORTED DISABILITY-RELATED DISCRIMINATION.**

64.     In accordance with the hearing requirements set forth in the USMS Contract, each year during the course of Plaintiff's employment with AKAL, Plaintiff appeared for his annual hearing examinations.  (See Pl. Tr., pp 35-36, 38-39).

65.     At his deposition, Plaintiff testified that the "hearing standards set forth in the [USMS Contract]" were: (1) "important"; (2) "not unlawful"; and (3) at all times throughout the course of his employment, followed with respect to Plaintiff's annual hearing examinations.  (See Pl. Tr., pp. 71 – 72).

66.     Significantly, each year, Fraterrigo confirmed in writing that he did not wear hearing aids, either on the job or otherwise.  (See Ex. "N").

67.     Consequently, each year, Fraterrigo was administered unaided hearing examinations.  (See id.).

68.     For each calendar year other than 2003, the USMS concluded that Fraterrigo was medically qualified to retain his CSO position.  (See Pl. Tr., pp. 42-43).

69.     At his deposition, Plaintiff confirmed he has "no complaints of any type with respect to [his] medical examinations . . . prior to 2003."  (See Pl. Tr., pp. 39-40).

70.     Throughout the course of Plaintiff's employment with AKAL (other than in connection with his June 2004 termination, which is discussed in detail below), Plaintiff did not experience any employment actions that he believed were motivated by his hearing.  (See Pl. Tr., p. 10).

71.     Throughout the course of Plaintiff's employment with AKAL, nobody from AKAL ever made any comments to Plaintiff, or engaged in any overt conduct directed to Plaintiff, regarding his hearing.  (See Pl. Tr., p. 10).

72.     Throughout the course of Plaintiff's employment with AKAL, Plaintiff never complained to any member of AKAL's management or Human Resources Department regarding disability-related discrimination in the workplace.  (See Pl. Tr., p. 11).

73.     Throughout the course of Plaintiff's employment with AKAL, Plaintiff never requested any accommodations for his hearing.  (See Pl. Tr. p. 12).

74.     Throughout the course of Plaintiff's employment with AKAL, Plaintiff never requested to use a hearing aid.  (See Pl. Tr., p. 12)

## V.     IN JUNE 2004, THE USMS DISQUALIFIED PLAINTIFF FROM SERVING AS A CSO BASED UPON PLAINTIFF'S FAILURE TO MEET THE USMS HEARING STANDARDS.

### A.     In January 2004, The USMS Concluded That Plaintiff Failed His 2003 Pure Tone Audiogram Examination.

75.     Pursuant to Step Number 1 of the hearing standards set forth in the USMS Contract, on or about September 19, 2003, Plaintiff presented for his annual 2003 unaided pure tone audiogram examination.  (See Ex. "O").

76.     United States Judicial Security Division Review Physician L. Chelton analyzed the results of Plaintiff's Unaided Pure Tone Audiogram.  (See id.).

77.     On January 12, 2004, Dr. Chelton concluded that Plaintiff failed his September 19, 2003 unaided pure tone audiogram examination and, pursuant to Step Number 2, directed that Fraterrigo (a) undergo further functional hearing tests, and (b) provide results of these tests within thirty (30) days.  (See id.).

15

78.     At his deposition, Plaintiff testified that he had no reason to believe that Dr. Chelton's conclusion that Plaintiff's pure tone audiogram did not meet the required [USMS] hearing standard was "factually incorrect." (See Pl. Tr., p. 57-58).

79.     On January 12, 2004, the USMS advised AKAL that Fraterrigo (among other AKAL employees) was required to submit supplemental information in order to remain qualified for a CSO position. (See Ex. "P").

80.     On January 14, 2004, in accordance with the USMS' directives, AKAL advised Fraterrigo in writing that he had until February 13, 2004 to provide the results from his functional hearing examinations. (See Ex. "Q").

81.     Thereafter, in good-faith, Plaintiff was granted an extension through and including March 22, 2004 to submit this supplemental documentation to AKAL. (See Ex. "R," see also Pl. Tr. pp. 62-63).

82.     The USMS authorized Plaintiff to consult with an independent physician of Plaintiff's own choosing to complete the functional hearing examination required by the USMS Contract. (See Pl. Tr., p. 51).

**B.     In March 2004, Plaintiff Met With An Audiologist Of His Own Choosing To Complete The Required Functional Hearing Examination.**

83.     On or about March 15, 2004, Plaintiff consulted with an ear, nose and throat specialist Dr. David Gitler. (See Pl. Tr., pp. 44-45).

84.     Dr. Gitler has never been employed by or otherwise associated with the USMS or with AKAL.[6] (See Gitler Tr. p. 7).

---

[6]     References to the transcript of Dr. Gitler's August 17, 2007 deposition testimony will be referred to herein as "Gitler Tr., p. ___" and are collectively attached as Ex. "S" to the Atlas Aff.

85.     Furthermore, Dr. Gitler is not familiar with the USMS hearing standards and he has no personal knowledge regarding how the USMS hearing standards were developed. (See Gitler Tr., pp. 7 – 8).

86.     Although Dr. Gitler could not recall any specific March 15, 2004 conversations he had with Plaintiff, Dr. Gitler testified that he has never advised any of his patients, one way or the other, whether their hearing met the USMS hearing standards.  (See Gitler Tr., pp. 27 – 28).

87.     Dr. Gitler further testified that he never communicated with the USMS or with AKAL regarding Plaintiff.  (See Gitler Tr., p. 37).

88.     Dr. Gitler referred Plaintiff to an audiologist, Rong Wang, to perform Plaintiff's functional hearing examinations.  (See Gitler Tr., p. 17).

89.     Prior to moving to the United States and obtaining a Master's Degree in audiology, Ms. Wang was a practicing surgeon in her native China.[7]  (See Wang Tr., pp. 8 – 9).

90.     Like Dr. Gitler, Ms. Wang has never been employed by nor associated with the USMS or with AKAL.  (See Wang Tr., pp. 14 – 15).

91.     Additionally, Ms. Wang testified that she is not familiar with the USMS hearing standards.  (See Wang Tr., p. 15).

92.     Ms. Wang completed the required USMS paperwork summarizing the results of Plaintiff's hearing examinations which confirms Plaintiff did not meet the USMS hearing standard.  (See Ex. "U"; see also Wang Tr., pp. 38-39, 45 ).

---

[7]     References to the transcript of Ms. Wang's August 22, 2007 deposition testimony will be referred to herein as ''Wang Tr., pp _____'' and are collectively attached as Ex. "T" to the Atlas Aff.

93.     At his deposition, Plaintiff testified he has no "reason to believe that any of the information contained in [Ms. Wang's written report summarizing the results of his hearing examination was] factually inaccurate." (See Pl. Tr., p. 65).

94.     Ms. Wang testified she did not verbally advise Fraterrigo, one way or another, whether his hearing met the USMS hearing standards  (See Wang Tr., p. 25)

95.     Plaintiff submitted Ms. Wang's examination results to the USMS through AKAL. (See Pl. Tr., p. 66).

96.     Ms. Wang testified that (other than completing the paperwork attached as Exhibit "R" to the Atlas Aff.) she has not communicated with the USMS or AKAL regarding Plaintiff. (See Wang Tr., p. 26).

97.     Plaintiff testified that he has no personal knowledge regarding any communications between Ms. Wang and the USMS and/or AKAL. (See Pl. Tr., p. 69).

C.     **In June 2004, The USMS Concluded That Plaintiff Failed The Supplemental Functional Hearing Exam Administered By Wang**

98.     On or about May 18, 2004, Dr. Chelton reviewed the results of Ms. Wang's independent hearing examination. (See Ex. "V").

99.     Based upon his review of Ms. Wang's functional hearing examination, Dr. Chelton concluded Plaintiff did not meet the USMS hearing standards. (See id.).

100.    Specifically, Dr. Chelton concluded that Fraterrigo has a "decreased ability to hear soft sounds and to distinguish speech, especially in background noise . . . [Fraterrigo's] reduced ability to perform these essential CSO functions poses a significant risk to the health and safety of himself, other co-workers and the public." (See id.).

101.    At his deposition, Plaintiff testified he has no reason to believe that any of Dr. Chelton's findings in this regard were factually inaccurate. (See Pl. Tr., p. 71).

102.    Because Plaintiff did not wear hearing aids (either on the job or otherwise) and because Plaintiff could not meet the USMS baseline hearing standards without a hearing aid, pursuant to the USMS Contract, no further testing was required.  (See Exhibits "G" and "K" and Paragraphs "16" and "44," supra).

103.    At this deposition, Plaintiff testified that his 2003 hearing examination (which led to his disqualification) was administered in the same manner as his prior years' hearing examination.  (See Pl. Tr., pp. 41-42).

104.    Furthermore, Plaintiff could not identify any provision in the USMS Contract which required the USMS and/or AKAL to re-test Plaintiff with a hearing aid.  (See Pl. Tr. 112-113, 117-118).

105.    On or about June 1, 2004, the USMS advised AKAL to immediately remove Plaintiff from his CSO position.  (See Ex. "W").

106.    On or about June 3, 2004, since AKAL did not have any alternative positions for which Plaintiff was not disqualified, AKAL communicated the USMS' determination that Plaintiff was disqualified from his CSO position.  (See Ex. "X"; see also Gunn Tr., p. 49).

107.    Plaintiff has no personal knowledge regarding any communications between AKAL and the USMS concerning Plaintiff's hearing or concerning the termination of Plaintiff's employment.  (See Pl. Tr., p. 11).

108.    At his deposition, Plaintiff testified that, to his knowledge, nobody from AKAL ever drew any conclusions about Plaintiff's hearing other than that, pursuant to the USMS Contract, Plaintiff's hearing disqualified him from serving in a CSO position.  (See Pl. Tr., p. 118).

**VI.    SUBSEQUENT TO THE JUNE 2004 TERMINATION OF PLAINTIFF'S EMPLOYMENT FROM AKAL, PLAINTIFF FAILED TO MAKE ANY MEANINGFUL EFFORTS TO SECURE NEW EMPLOYMENT.**

109.    "A short time" after the termination of his employment from AKAL, Plaintiff purportedly "called a few security companies [to] see if they needed anyone." (See Pl. Tr., p. 88).

110.    Although Plaintiff could not recall the names of these purported "security companies," Plaintiff testified that he located them in the "phone book." (See Pl. Tr., pp. 88 – 89).

111.    Significantly, other than these alleged and undocumented "cold-calls" to unidentified security companies "shortly after his termination," Plaintiff did not do "anything else to look for a job." (See Pl. Tr., p. 89) (emphasis added).

112.    After making these initial alleged and undocumented telephone calls, Plaintiff did not follow-up in any way with these purported security companies. (See Pl. Tr., p. 91).

113.    Plaintiff did not check help wanted ads in the newspaper. (See id.)

114.    Plaintiff did not go on the internet to seek job opportunities. (See id.)

115.    Plaintiff did not write any letters to any potential employers. (See Pl. Tr., p. 92)

116.    Subsequent to the termination of his employment from AKAL, Plaintiff did not prepare a resume in order to try to get a job. (See id.)

117.    Subsequent to the termination of his employment from AKAL, Plaintiff did not seek employment in any other field other than with alleged "security companies." (See id.)

118.    Subsequent to the termination of his employment from AKAL, Plaintiff did not contact any employment agencies or any temporary employment agencies (See Pl. Tr., p. 93).

119.    After Plaintiff stopped receiving unemployment insurance compensation stemming from the termination of his employment from AKAL, Plaintiff stopped looking for work altogether.  (See Pl. Tr., pp. 96 – 97).

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038
(212) 545-4000

By: _____
Clifford R. Atlas (CA 9512)
Matthew A. Steinberg (MS 3979)

ATTORNEYS FOR DEFENDANT
AKAL SECURITY, INC.

Dated: February 1, 2008
         New York, New York

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2008, a true and correct copy of the foregoing Statement Of Undisputed Material Facts In Support Of Defendant's Motion For Summary Judgment was served on Plaintiff Richard Fraterrigo via ECF and First Class United States Mail to Plaintiff's counsel of record, Constantino Fragale, Esq., Law Offices of Constantino Fragale, 575 White Plains Road, Eastchester, New York 10709.

_____
Matthew A. Steinberg, Esq.