UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
:
:
RICHARD FRATERRIGO,                             :        06 Civ. 9861 (SHS)
:
                    Plaintiff,                  :        OPINION & ORDER
:
        -against-                               :
:
AKAL SECURITY, INC.,                            :
:
                    Defendant.                  :
:
:
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

    Plaintiff Richard Fraterrigo formerly worked as a Court Security Officer ("CSO") at the

Thurgood Marshall federal courthouse in New York.  He was employed by defendant Akal

Security, Inc., a company under contract with the United States Marshals Service ("USMS") to

provide security at federal courthouses.  Akal Security removed Fraterrigo from his CSO

position after he failed a hearing test required by the USMS.  After filing a charge of

discrimination before the United States Equal Employment Opportunity Commission and

receiving a "right to sue" letter (see Compl. ¶ 17), Fraterrigo brought this action alleging that his

removal violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; the

New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq.; and the New York

City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107.[1]  Following discovery

proceedings, Akal Security has moved for summary judgment in its favor pursuant to Fed. R.

---

[1] Fraterrigo's complaint also alleged age discrimination pursuant to the Age Discrimination in Employment Act, 29
U.S.C. § 621 et seq.; N.Y. Exec. Law § 290 et seq.; and New York City Admin. Code § 8-107.  (Compl. ¶¶ 39-47.)
The parties subsequently stipulated to dismiss those claims with prejudice.  (See Stipulation & Order dated Dec. 14,
2007.)

1

Civ. P. 56, and Fraterrigo has cross-moved for partial summary judgment. Because Fraterrigo was neither disabled nor "regarded as" disabled as defined by the ADA, 42 U.S.C. § 12102(2), and because the USMS hearing aid policy as applied to Fraterrigo was "job related" and "consistent with business necessity" pursuant to 42 U.S.C. § 12113(a), Akal Security's motion for summary judgment is granted, and Fraterrigo's cross-motion is denied.

## I.     BACKGROUND

Fraterrigo took a job as a CSO after working for more than twenty years in the New York City Police Department. (Pl.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") at 13, ¶ 5.) For another two decades he served as a CSO for different private security companies, his employment with Akal Security beginning in 1998. (Id.; Def.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1") ¶¶ 7, 10.)

### A.     Fraterrigo's Medical Disqualification

In September 2003, at the age of seventy-two, Fraterrigo participated in an annual hearing test mandated by the USMS. Dr. L. Chelton, a physician with the Judicial Security Division of the USMS, reviewed the results of Fraterrigo's examination and found that he "did not meet the required hearing standard." (See Judicial Security Division Medical Review Form dated Dec. 10, 2003 at 1, Ex. O to Aff. of Clifford R. Atlas dated Feb. 1, 2008 ("Atlas Aff.").) However, rather than immediately disqualifying Fraterrigo from serving as a CSO, Chelton "deferred" making a final medical determination "pending further documentation." (Id.) Chelton directed Fraterrigo to see an ear, nose, and throat physician or an audiologist "for further functional hearing tests" (id.), and Fraterrigo complied with that request in March 2004 (see Examination Report of Dr. Rong Wang dated Mar. 15, 2004, Ex. U to Atlas Aff.).

The next month, Chelton reviewed the results of Fraterrigo's functional hearing tests and

found that Fraterrigo had "a significant hearing loss in the conversational range." (Judicial

Security Division Medical Review Form dated May 18, 2004 ("Medical Review Form") at 1, Ex.

V to Atlas Aff.) Chelton also consulted with a USMS audiologist, who described Fraterrigo's

hearing loss as follows:

> "[Fraterrigo's] level of sensitivity is significantly reduced in both ears across the
> frequency spectrum. As evidenced by both the pure tone and speech reception
> thresholds, he is likely to be unaware of acoustic stimuli until it is of moderate
> loudness, or the source is very close by. In fact, many mild to moderate intensity
> sounds will be imperceptible to him even at very close range . . . . [T]his may
> present a significant risk to his safety, those of his co-workers, and those he is
> sworn to protect . . . . Background noise and/or a reverberant listening
> environment will further decrease his ability to recognize and respond
> appropriately to vocal signals."

(Id. (quoting audiologist) (ellipses in original).) Based on the audiologist's findings, Chelton

found that Fraterrigo's "decreased ability to hear soft sounds and to distinguish speech,

especially in background noise," posed "a significant risk to the health and safety of himself,

other co-workers, and the public." (Id.) Chelton concluded that Fraterrigo was "[n]ot medically

qualified to perform the essential functions of the job" of CSO. (Id.)

The USMS notified Akal Security that Fraterrigo was not medically qualified to continue

working as a CSO. (See Letter from Maxine W. Robinson, Contracting Officer, USMS, to Daya

Khalsa, Akal Sec., Inc. dated June 1, 2004, Ex. W to Atlas Aff.) Akal Security then terminated

Fraterrigo's employment, as it was required to do under its contract with the USMS. (See Letter

from Chand Khalsa, Human Res. Officer, Akal Sec., Inc., to CSO Richard Fraterrigo dated June

3, 2004, Ex. X to Atlas Aff..)

B.     The USMS Requirements for Unaided Hearing Proficiency

Fraterrigo contends that he should have been allowed to wear a hearing aid during his

hearing tests. USMS medical standards, however, require that CSOs demonstrate a certain

minimum hearing proficiency without the assistance of hearing aids. (Def.'s 56.1 ¶ 44; Pl.'s 56.1 at 6, ¶¶ 42-44.) Those standards were approved by the Judicial Conference of the United States, the entity of federal judges that establishes policy for the judicial branch. (Def.'s 56.1 ¶¶ 24, 29-30, 40-44; Pl.'s 56.1 at 4-6, ¶¶ 24, 29, 30, 40-44.) After a number of federal judges expressed concerns that CSOs were not physically qualified to respond to security threats, the Judicial Conference's Committee on Security and Facilities (the "Committee") commissioned a study in 1999 to recommend changes to CSO medical standards. (Def.'s 56.1 ¶¶ 28-29, 31; Pl.'s 56.1 at 5, ¶¶ 28-29, 31.)

To lead the study, the Committee appointed Dr. Richard J. Miller, who at the time was the Director of Law Enforcement Medical Programs for the United States Public Health Service's Office of Federal Occupational Health. (Def.'s 56.1 ¶¶ 29-30; Pl.'s 56.1 at 5, ¶¶ 29-30.) Miller collected data from five U.S. courthouses, directly observing CSOs performing their duties. (See Def's 56.1 ¶ 34; Fed. Occupational Health Law Enforcement Med. Programs, Final Report: Medical Requirements for Court Security Officers 5 (2000) ("Final Report"), Ex. J to Atlas Aff.) He oversaw focus groups made up of judges, marshals, and CSOs, and he sought information from experts in law enforcement medicine, including an occupational audiologist from the National Naval Medical Center. (See Def's 56.1 ¶ 34; Final Report 6-7.)

Miller identified twenty-one "essential job functions" for CSOs. (Def.'s 56.1 ¶ 35; Pl.'s 56.1 at 5, ¶ 35.) Several of those job functions related to hearing. Miller found that CSOs were required to "[h]ear sounds that require investigation;" to "[d]etermine [the] location of sounds;" and to communicate face-to-face, over the telephone, via radio transmissions, and "when you cannot see another CSO." (Id.) Miller then recommended medical requirements designed to ensure that CSOs could perform their essential job functions. (Def.'s 56.1 ¶¶ 37-38; Pl.'s 56.1 at

5, ¶¶ 37-38.)  With respect to hearing, Miller proposed minimum hearing standards and concluded that CSOs must be able to meet those standards without the assistance of hearing aids. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 at 6, ¶ 45; see also Final Report 21.)

Hearing aids, Miller explained, do not restore those with hearing loss to normal hearing. (Def.'s 56.1 ¶ 47; Pl.'s 56.1 at 6, ¶ 47.)  Indeed, the FDA requires a warning to that effect on every hearing aid sold in the United States.  (Def.'s 56.1 ¶ 62; Pl.'s 56.1 at 8, ¶ 62; see also Decl. of Richard J. Miller dated June 29, 2006 ("Miller Decl.") ¶ 25, Ex. I to Atlas Aff.; Dep. of Patricia Chute, M.D., dated Nov. 5, 2007 ("Chute Dep.") at 86, Ex. M to Atlas Aff.)  Miller also found that hearing aids are least effective in situations involving loud background noise, "where hearing impaired individuals need the greatest enhancement and where CSOs face the most critical and safety-sensitive situations."  (Def.'s 56.1 ¶ 48; Miller Decl. ¶ 25.)  Finally, hearing aids can malfunction, they can become dislodged, and their batteries can fail.  (Def.'s 56.1 ¶¶ 49-50; Pl.'s 56.1 at 6, ¶¶ 49-50; see also Miller Decl. ¶ 25; Chute Dep. at 106-08, Ex. V to Decl. of Constantino Fragale dated Mar. 1, 2008 ("Fragale Decl.").)

In addition, in some cases a hearing aid can actually "degrade a user's ability to determine the direction and location from which a sound is coming."  (Decl. of Judge Jane R. Roth dated Nov. 29, 2004 ("Roth Decl.") ¶ 10, Ex. H to Atlas Aff.)  In an emergency situation, Miller reasoned, a CSO with substandard, unaided hearing would be unable to hear potential threats or understand instructions from superiors if his or her hearing aid had malfunctioned or become dislodged.  (Def. 56.1 ¶ 55; Pl.'s 56.1 at 7, ¶ 55; see also Miller Decl. ¶ 27.)  All of those considerations influenced the Committee on Security and Facilities and, in turn, the Judicial Conference to adopt the conclusions of Miller's Final Report (see Def.'s 56.1 ¶ 41; Pl.'s 56.1 at 5, ¶ 41) and to approve a contract with Akal Security that called for CSOs to meet minimum

hearing standards without the assistance of hearing aids (see Roth Decl. ¶ 10).

The Judicial Conference did not, however, choose to ban the use of hearing aids altogether. Based on Miller's recommendation, the contract with Akal Security allowed CSOs to wear hearing aids if they had first passed the hearing examination without hearing aids. (Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.) The reason for that policy, Miller stated, was to let CSOs enhance their hearing through hearing aids, as long as they could demonstrate that they could hear above the minimum acceptable threshold if their hearing aids failed or became dislodged. (Id.; see also Miller Decl. ¶¶ 25-27; Roth Decl. ¶ 10.)

## II.   DISCUSSION

Summary judgment is appropriate if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). The non-moving party, however, "may not rely on mere conclusory allegations or speculation, but instead must offer some hard evidence" in support of its factual assertions. Id. (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

The ADA provides that an employer may not "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A plaintiff claiming a violation of the ADA must show that (1) the plaintiff's employer was covered by the ADA, (2) the plaintiff suffered from or was regarded as suffering from a disability within the meaning of the ADA, (3) the plaintiff was otherwise qualified to perform the essential functions

of the job, with or without reasonable accommodation, and (4) the plaintiff suffered an adverse employment action because of his or her disability or perceived disability. See Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005) (citing Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003)). As a defense to an ADA claim, an employer may assert that "an alleged application of qualification standards, tests, or selection criteria that screen out . . . an individual with a disability has been shown to be job-related and consistent with business necessity." 42 U.S.C. § 12113(a).

The parties agree that Akal Security is covered by the ADA. It is clear, moreover, that Fraterrigo was removed from his position because of his hearing difficulties. (Def.'s 56.1 ¶¶ 20-21; Pl.'s 56.1 at 4, ¶¶ 20-21.) What the parties dispute is whether Fraterrigo's hearing loss amounted to a "disability" within the meaning of the ADA and whether the USMS hearing aid policy was "job-related" and "consistent with business necessity" pursuant to 42 U.S.C. § 12113(a).

A. Fraterrigo Did Not Have a "Disability" as Defined by the ADA

To show a "disability" as defined by the ADA, an individual must demonstrate that he or she suffers from "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual," that he or she has "(B) a record of such impairment," or that he or she has "(C) [been] regarded as having such an impairment." 42 U.S.C. § 12102(2). Fraterrigo expressly denies having had a "record" of a hearing impairment, as he states that his 2003 examination was the first time anyone had suggested that he had a hearing problem. (See Dep. of Richard Fraterrigo dated June 14, 2007 ("Fraterrigo Dep.") at 8-12, Ex. E to Atlas Aff.) Thus, Fraterrigo must show that he actually suffered from a hearing impairment pursuant to 42 U.S.C. § 12102(2)(A) or that he was "regarded as having such an

impairment" pursuant to 42 U.S.C. § 12102(2)(C).  On this record, he has shown neither.

### 1. *Fraterrigo's Hearing Loss Was Not an Actual Disability*

Establishing an actual disability for the purposes of the ADA requires a plaintiff to show that he or she suffered "a physical or mental impairment that substantially limit[ed] one or more . . . major life activities."  42 U.S.C. § 12102(2)(A); see also Bragdon v. Abbott, 524 U.S. 624, 631, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998).  Here, Fraterrigo alleges that his hearing loss affected two "major life activities": his ability to hear and his ability to work.  Contrary to Fraterrigo's allegations, however, the record indisputably shows that his ability to hear and his ability to work were not "substantially limit[ed]."  42 U.S.C. § 12102(2)(A).

Fraterrigo's hearing loss did not affect the major life activity of hearing because, by his own account, his hearing loss was mild.  When asked in his deposition whether his "loss of hearing [had] impacted [his] day-to-day life in any way," Fraterrigo's reply, remarkably, was "No."  (Fraterrigo Dep. 8.)  Confirming that he had not misspoken, Fraterrigo stated that he had never been treated for hearing loss, that he didn't wear a hearing aid, that he didn't believe he needed to wear a hearing aid, and that no one had ever suggested that he wear a hearing aid.  (Id. 8-9.)  He even went so far as to say, "Well, I don't feel right now that I have a hearing problem. I think I could hear pretty good."  (Id. 115.)  Lest there be any doubt as to his position, Fraterrigo added that he did not feel he had a hearing impairment "at all."  (Id. 116.)  In the face of such admissions, Fraterrigo's assertion that his hearing is "substantially limit[ed]" rings hollow.  No reasonable juror could find that Fraterrigo's hearing loss impacted his ability to undertake the major life activity of hearing, given Fraterrigo's direct and unequivocal sworn statements.

Nor could a reasonable juror find that Fraterrigo's hearing loss impacted the major life activity of working.  A plaintiff who bases an ADA claim on a substantially limited ability to

work must "show more than restrictions on the specific job at which he worked; he must show restrictions on the ability to perform a class of jobs." Bonilla v. Potter, No. 04 Civ. 3205, 2007 U.S. Dist. LEXIS 3651, at *9-10 (S.D.N.Y. Jan. 17, 2007) (citing 29 C.F.R. § 1630.2(j)(3)(i)). Fraterrigo, however, has demonstrated only that he is unable to work in his former job as a CSO. Though he claims to have tried and failed to find another security guard job (see Fraterrigo Dep. 88-97), he presents no facts to show that his inability to find new employment was due to his hearing loss. Instead, he forthrightly states that it is his age—he is seventy-three—and not his hearing loss that has frustrated his job search. (Fraterrigo Dep. 96-97.) As noted above, this case presents no claims of age discrimination. (See Stipulation & Order dated Dec. 14, 2007.)

Fraterrigo has not offered any evidence to suggest that his hearing loss has disqualified him from the entire "class" of law enforcement and security guard jobs. In fact, he has offered evidence to the contrary: in support of his position that the use of a hearing aid was a "reasonable accommodation" under the ADA, Fraterrigo maintains that law enforcement agencies regularly hire individuals with correctable hearing loss. (See Mun. Police Training Council, Medical & Physical Fitness Standards and Procedures for Police Officer Candidates 7-8 (2003), Ex. N to Fragale Decl.) If that is the case, then Fraterrigo's hearing loss presents no obstacle to his employment in the law enforcement sector. There is, therefore, no genuine issue of fact with respect to Fraterrigo's ability to work. The record contains no indication that Fraterrigo's hearing loss caused any professional ramification beyond his serving as a CSO in the federal courts.

Fraterrigo's theory of this case—that he would be able to achieve the USMS hearing standards with the use of a hearing aid—further undermines his claim to an actual disability as defined by the ADA. In Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L.

Ed. 2d 140 (1999), the Supreme Court addressed ADA claims brought by airline pilots who wore glasses to correct for vision impairments. The Court held that the pilots did not present actual disabilities for purposes of the ADA because the pilots' vision was correctable. The Court reasoned that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." Id. at 482. In attempting to understand Congress's intent in passing the ADA, the Court focused on a reference in 42 U.S.C. § 12101(a)(1) to the "43,000,000 Americans" with disabilities that the ADA was meant to protect. Id. at 484. That figure would not make sense, the Court wrote, if it included every American with a vision impairment (there were, at the time, one-hundred million such individuals) and every American with a hearing impairment (twenty-eight million such individuals). Id. at 487 (citing studies of disability rates, include rates of hearing impairment). Instead, the "43 million figure reflect[ed] an understanding that those whose impairments [were] largely corrected by medication or other devices [were] not 'disabled' within the meaning of the ADA." Id. at 486.

Fraterrigo, therefore, cannot claim an actual disability, because his principal assertion in this case is that his hearing impairment is easily correctable. (See Fraterrigo Dep. 10; Pl.'s Mem. in Opp'n to Summ. J. 11 ("[P]laintiff contends that with the reasonable accommodation of a hearing aid, he would have met the subject hearing requirements which he marginally failed without any accommodation.").) Sutton teaches that an employer may, consistent with the ADA, base employment decisions on "physical characteristics or medical conditions that do not rise to the level of an impairment," 527 U.S. at 490, including otherwise significant impairments that can be corrected by "medication or other measures," id. at 482. Thus, if Fraterrigo's hearing loss

can be corrected with hearing aids, his hearing loss is a physical impairment that, following the

clear mandate of the Supreme Court in <u>Sutton</u>, is not covered by the ADA.

 <u>Sutton</u> controls this case even though Fraterrigo has never in fact worn hearing aids.

(Fraterrigo Dep. 9.)  The airline pilots in <u>Sutton</u> wore glasses at the time they suffered adverse

employment actions, and thus that Court primarily addressed the situation where an ADA

plaintiff "<u>is taking</u> measures to correct for . . . a physical . . . impairment."  527 U.S. at 482

(emphasis added); <u>see also</u> <u>id.</u> at 482 (interpreting the ADA "as requiring that a person be

presently—not potentially or hypothetically—substantially limited in order to demonstrate a

disability").  Fraterrigo's situation differs slightly, as he has not yet taken the corrective measure

of installing hearing aids.  Nevertheless, <u>Sutton</u> applies squarely to this case, as Fraterrigo's

claim for relief is premised on the fact that hearing aids for Fraterrigo, as with glasses for the

pilots in <u>Sutton</u>, would allow Fraterrigo to correct his impairment.  <u>Cf.</u> <u>Charneco v. Dep't of</u>

<u>Educ.</u>, 2006 U.S. Dist. LEXIS 2281, at *9-10 (S.D.N.Y. Jan. 18, 2006) ("[A]s a matter of law, no

substantial limitation of a major life activity can be shown where an individual is able to correct

his or her physical or mental impairment through the use of medication.").

## 2. *Fraterrigo Was Not "Regarded as" Disabled*

Even if Fraterrigo's hearing loss did not constitute an actual hearing impairment, he could still show a "disability" for purposes of the ADA if he was "regarded as having such an impairment" pursuant to 42 U.S.C. § 12102(2)(C). He must, however, present evidence that he was regarded as having an impairment as defined by the ADA—an impairment that "substantially limit[ed] one or more . . . major life activities." 42 U.S.C. § 12102(2)(A); see Francis v. City of Meriden, 129 F.3d 281, 285 (2d Cir. 1997). Just as with his claim to an actual disability, he has again failed to create a genuine issue of fact on the question of whether he was "regarded as" having such an impairment.

Fraterrigo's only support for the claim that he was "regarded as" having a disability comes from the Medical Review Form completed by Dr. Chelton, the USMS physician that declared Fraterrigo "[n]ot medically qualified to perform the essential functions of the job." (Medical Review Form 1.) Evaluating the results of Fraterrigo's hearing tests, Chelton wrote that Fraterrigo had "a significant hearing loss in the conversational range" and "a decreased ability to hear soft sounds and to distinguish speech, especially in background noise." (Id.) He concluded that Fraterrigo's "reduced ability to perform these essential CSO functions pose[d] a significant risk to the health and safety of himself, other co-workers, and the public." (Id.) Chelton's findings, Fraterrigo maintains, demonstrate that Fraterrigo was "regarded as" suffering from hearing loss that was so severe that it substantially limited the major life activities of hearing and working.

Fraterrigo's claim puts more weight on the Medical Review Form than it can bear. By its terms, the Form was designed to support a determination as to whether the person examined was able to perform his or her job functions. The medical review was limited, therefore, to analyzing

Fraterrigo's ability to function as a CSO, and in completing the Form, Chelton concluded that Fraterrigo was "[n]ot medically qualified <u>to perform the essential functions of the job</u>." (<u>Id.</u> (emphasis added).) He indicated nothing about Fraterrigo's life beyond his employment with Akal Security. To be sure, Chelton cited Fraterrigo's "significant hearing loss in the conversational range" and his "decreased ability to hear soft sounds and to distinguish speech." (<u>Id.</u>) Those are impairments that, in the abstract, might implicate Fraterrigo's ability to undertake the major life activities of hearing or working. In the context of the Medical Review Form, however, Chelton manifestly referenced Fraterrigo's ability to hear conversational speech and soft sounds only insofar as they were "essential CSO functions." (<u>Id.</u>) Likewise, Chelton's concern about the "health and safety of [Fraterrigo], other co-workers, and the public" was not a general conclusion about Fraterrigo's ability to function in society but a specific conclusion about Fraterrigo's inability to perform a job whose main purpose was to provide security. (<u>Id.</u>)

To create a genuine issue of fact about whether he was "regarded as" disabled for the purposes of the ADA, additional evidence would be needed—something more than the Medical Review Form—showing how Fraterrigo's employers viewed the effect of his hearing loss on his life outside the courthouse. With respect to the major life activity of hearing, Fraterrigo provides no additional evidence about how Fraterrigo's employers regarded his ability to hear in ordinary situations unrelated to court security. Of course, Fraterrigo's employers thought that he could not hear well enough to serve as a CSO, where the "ability to hear soft sounds and to distinguish speech, especially in background noise" were "essential functions of the job." (<u>Id.</u>)

But what Fraterrigo's employers thought about his ability to function as a CSO did not show what they thought about his hearing in comparison "to how unimpaired individuals normally use their hearing in daily life." <u>Walton v. U.S. Marshals Serv.</u>, 492 F.3d 998, 1009

(9th Cir. 2007) (holding that a CSO with "'only one functioning ear'" was not "regarded as" disabled, when a USMS physician had found that the CSO was "'unable to localize sound'" and thus "'pose[d] a significant risk to the health and safety of [her]self, other law enforcement officers and the public'"). But see Allmond v. Akal Sec., Inc., No. 4:05-cv-96, 2007 U.S. Dist. LEXIS 72713, at *23 (M.D. Ga. 2007) (addressing a medical review in which a USMS physician wrote that a CSO had "severe conversational hearing loss" and concluding that the CSO had established a genuine issue of fact about whether he was "regarded as" disabled). Therefore, though Fraterrigo's employers undeniably thought his hearing loss was substantially limiting in terms of his ability to serve as a CSO, there is no evidence to support an inference that Fraterrigo's employers regarded his hearing loss as substantially limiting in terms of the major life activity of hearing.

With respect to the major life activity of working, Fraterrigo again fails to provide evidence that his employers regarded his hearing loss as substantially limiting. As discussed above, an ADA plaintiff claiming a substantial limitation of his ability to work must "show more than restrictions on the specific job at which he worked; he must show restrictions on the ability to perform a class of jobs." Bonilla, 2007 U.S. Dist. LEXIS 3651, at *9-10 (citing 29 C.F.R. § 1630.2(j)(3)(i)). A plaintiff claiming that he was "regarded as" suffering from an impaired ability to work, therefore, must show that his employer believed that he was unable to perform not just his former job, but all positions within that "class of jobs."

Fraterrigo maintains that the Medical Review Form alone demonstrates that he was regarded as unfit to serve in any security guard position. That, however, is an inference no reasonable juror could make. Disqualification from a "single job . . . does not support the claim that [an employer] regards [an employee] as having a substantially limiting impairment."

14

Sutton, 527 U.S. at 493 (citing 29 C.F.R. § 1630.2(j)(3)(i)).  "Standing alone," therefore, a "failure to meet the USMS hearing standards does not raise a genuine issue of material fact that the USMS" or Akal Security "regarded [a CSO] as disabled."  Walton, 492 F.3d at 1007.  Without further evidence showing how his employers viewed his job prospects outside the federal courts, Fraterrigo's claim that he was regarded as being unable to work must fail.

In sum, the evidentiary deficiencies in Fraterrigo's case compel a finding that, as a matter of law, Fraterrigo's hearing loss did not meet the definition of "disability" in 42 U.S.C. § 12102(2).  Fraterrigo admitted that his hearing loss was mild and correctable, and he has adduced nothing to show that his hearing prevented him from working as a security guard or law enforcement official anywhere other than the federal courts.  Fraterrigo's only evidence that he was "regarded as" disabled, moreover, is the Medical Review Form that disqualified him only from working as a CSO.  That, by itself, is insufficient to create a genuine issue of fact about whether his employers regarded him to be "substantially limit[ed]" in the "major life activities" of hearing and working.  Thus, as a matter of law, Fraterrigo did not have a disability—and was not regarded as having a disability—as defined by the ADA.

B.      The USMS Hearing Aid Policy Was a "Business Necessity"

Even assuming that Fraterrigo could show that he was disabled for purposes of the ADA, the USMS hearing aid policy as applied to Fraterrigo did not constitute unlawful discrimination.  To make out a prima facie ADA claim, Fraterrigo must show not only that he was disabled but also that he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.  Capobianco, 422 F.3d at 56.  Fraterrigo does not dispute that he failed the USMS hearing test without accommodation.  Rather, he maintains that he would have been "otherwise qualified" to serve as a CSO if he was provided with what he views as the

"reasonable accommodation" of a hearing aid. Akal Security responds that a hearing aid was not a "reasonable accommodation" and, in any event, that Akal Security should prevail in this action based on the ADA's affirmative defense for qualification standards that are "job-related and consistent with business necessity." 42 U.S.C. § 12113(a).

Overlapping burdens of proof apply in determining whether the ADA prohibited Akal Security from applying the USMS hearing aid policy to Fraterrigo. As part of his prima facie claim of discrimination, Fraterrigo bears the burden of showing that the use of a hearing aid was a reasonable accommodation that made him otherwise qualified to serve as a CSO. By asserting the affirmative defense contained in 42 U.S.C. § 12113(a), however, Akal Security bears the burden of showing that the hearing aid policy was <u>not</u> a reasonable accommodation. That is because Section 12113(a) requires Akal Security to demonstrate that the hearing aid policy "has been shown to be job-related and consistent with business necessity" and also that "performance cannot be accomplished by reasonable accommodation, as required under this title." <u>See also</u> <u>Chevron v. Echazabal</u>, 536 U.S. 73, 78, 122 S. Ct. 2045, 153 L. Ed. 2d 82 (2002) (explaining that qualification standards are permissible only "if the individual cannot perform the job safely with reasonable accommodation"). Courts have reached varying conclusions about how to apply those overlapping burdens. <u>See</u> <u>Bosket v. Long Island R.R.</u>, No. CV 00-7532, 2004 U.S. Dist. LEXIS 10851, at *24 n.7 (E.D.N.Y. June 4, 2004) (collecting cases). Because this Court is granting summary judgment to Akal Security, it will assume that the burden falls on Akal Security to show that the hearing aid policy was "job-related," that it was "consistent with business necessity," and that the use of a hearing aid was not a "reasonable accommodation" pursuant to Section 12113(a). That is a burden that Akal Security has met.

*Akal Security Has Adduced Sufficient Evidence to Prevail Under the ADA's "Business Necessity" Affirmative Defense*

There is no question that the USMS hearing aid policy was "job-related." The Judicial Conference approved that policy based on the <u>Final Report</u> of Dr. Richard J. Miller, who conducted a detailed study of CSO job requirements. Several of the twenty-one "essential job functions" that Miller identified in the <u>Final Report</u> involved hearing (Def.'s 56.1 ¶ 35; Pl.'s 56.1 at 5, ¶ 35), and the hearing aid policy was designed to ensure that CSOs were capable of performing those essential job functions that related to hearing (Def.'s 56.1 ¶¶ 37-38). Fraterrigo offers no meaningful challenge to the notion that the hearing aid policy was "job-related" and in fact admitted that hearing was a vital part of his job as a CSO. (Fraterrigo Dep. 32.)

Fraterrigo does, however, challenge Akal Security's claim that the hearing aid policy was "consistent with business necessity." His principal contention is that the USMS "failed to provide any methodology or medical data concerning the reason for choosing the 'no hearing aids' rule." (Pl.'s Mem. in Opp'n to Summ. J. 12.) Fraterrigo's reasoning relies heavily on <u>Bosket</u>, an ADA case involving the Long Island Railroad's policy that "assistant signalmen 'have better than 50% hearing in the speech range without the use of hearing aid.'" 2004 U.S. Dist. LEXIS 10851, at *2. The Railroad claimed that its hearing aid policy was a business necessity and sought summary judgment on that basis. The court held that summary judgment was not warranted, as the Railroad had borrowed its policy from guidelines published by the Association of American Railroads ("AAR") and had "offer[ed] only the most general, conclusory arguments concerning safety to justify its reliance on the AAR standard." <u>Id.</u> at *30. This case is similar, Fraterrigo maintains, in that the USMS provided only unscientific and superficial justification for its hearing aid policy.

That view of the USMS hearing aid policy is belied by the evidence. Unlike the Long Island Railroad in <u>Bosket</u>, the USMS undertook a thorough study of CSO job requirements before determining that CSOs must meet minimum hearing standards without the use of hearing aids. Miller, who conducted the study, amassed data from observations of CSOs in five different courthouses, through interviews with focus groups made up of court personnel, and by consulting with experts in law enforcement medicine, including an occupational audiologist from the National Naval Medical Center. (<u>See</u> Def's 56.1 ¶ 34; <u>Final Report</u> 6-7.) He identified essential job functions and tailored medical standards to meet those functions. The hearing aid policy in particular was based on the concern that hearing aids do not restore normal hearing; that hearing aids are least effective when there is loud background noise, such as can occur in courthouses and certainly can occur in the course of emergencies; and that hearing aids can malfunction, lose power, and become dislodged. (Def.'s 56.1 ¶¶ 47-50, 62; Pl.'s 56.1 at 6, 8 ¶¶ 47-50, 62; <u>see also</u> Chute Dep. 86, 106-08; Miller Decl. ¶¶ 25, 27; Roth Decl. ¶ 10.) Far from the "general, conclusory" considerations grounding the hearing aid policy at issue in <u>Bosket</u>, 2004 U.S. Dist. LEXIS 10851, at *30, the USMS's hearing aid policy was the product of a reasoned decisionmaking process tailored to the unique job environment faced by CSOs. <u>Accord</u> <u>Allmond</u>, 2007 U.S. Dist. LEXIS 72713, at *37-41.

The evidence offered by Akal Security, therefore, establishes that the USMS hearing aid policy is "consistent with business necessity" pursuant to 42 U.S.C. § 12113(a). So too does the evidence demonstrate that the safety goals of the USMS and Akal Security "cannot be accomplished by reasonable accommodation." <u>Id.</u> The USMS policy does accommodate some CSOs, allowing them to wear hearing aids if they are able to meet the minimum hearing standards unaided. (Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58; <u>see also</u> Miller Decl. ¶¶ 25-27; Roth Decl.

¶ 10.)  It would be unreasonable, however, to require such an accommodation for Fraterrigo, as he cannot show that he would retain the minimum acceptable level of hearing if his hearing aid malfunctioned, lost power, or became dislodged.

<blockquote>
2.  *Fraterrigo Has Failed to Create a Genuine Issue of Fact About Akal Security's "Business Necessity" Defense*
</blockquote>

Fraterrigo does not dispute that the hearing aid policy was created in the manner described by Akal Security.  Instead, in an attempt to create a genuine issue of fact about Akal Security's business necessity defense, he makes several arguments to show that the USMS hearing aid policy was misguided.  Not one gets off the ground.

First, Fraterrigo disputes the contention that a hearing aid could fail or become dislodged by pointing out that the USMS cites no actual examples of hearing aids having failed or having become dislodged in critical security situations.  That argument is meritless, as the ADA could not possibly force an employer to wait to take safety measures until after a dangerous situation actually occurs.  As the court in <u>Allmond</u> reasoned in addressing a similar argument about the USMS hearing aid policy:

> [T]he human risks that are present with the CSO position not only permit such "what if" thinking, they demand it.  It is the job of the CSO to be prepared for any occurrence.  Likewise, it is the job of the Marshals Service to ensure that its CSOs are capable of meeting any occurrence, whether or not foreseeable.

<u>Allmond</u>, 2008 U.S. Dist. LEXIS 72713, at *38.  This Court agrees.  CSOs are vital components of the USMS's effort to keep federal courthouses safe.  The USMS may, consistent with the ADA, anticipate safety concerns for CSOs even if they have never before posed a problem.

Second, Fraterrigo faults Miller for being unable to cite scientific studies to support the hearing aid policy.  Scientific studies, however, were not necessary for Akal Security to meet its evidentiary burden to establish the business necessity defense.  Miller's considered

determination in conjunction with his study of CSO job requirements was enough. The mere absence of scientific studies does not create a genuine issue of fact about the ability of hearing aids to fail, especially since Fraterrigo's own expert confirms that hearing aid batteries do "die." (Chute Dep. 106.)

Third, Fraterrigo attempts to refute the claim that hearing aids can fail by citing Strathie v. Dep't of Transp., 716 F.2d 227, 232-34 (3d Cir. 1983), a class action challenging the Pennsylvania Department of Transportation's policy of prohibiting bus drivers from wearing hearing aids. In response to concerns that the hearing aids would fail or become dislodged, the plaintiffs in Strathie offered specific solutions to the possibility of hearing aid failures and supported those solutions with evidence. Even if they were appropriate for the bus drivers in Strathie, however, Fraterrigo offers no facts showing that the solutions offered by the Strathie plaintiffs would work for security personnel in the context of federal courthouses. Merely citing to a line of reasoning in another court case is not sufficient for Fraterrigo to create a genuine issue of fact here.

Fourth, Fraterrigo attempts to cast doubt on the quality of Miller's Final Report by arguing that Miller did not have the audiological expertise necessary to create the hearing aid policy. But that argument would apply equally to each medical qualification contained in the Final Report, including its cardiovascular, dermatological, metabolic, gastrointestinal, hematological, musculoskeletal, neurological, psychiatric, respiratory, and visual standards. (See Final Report 13-32.) Surely the ADA does not require the USMS to hire a separate medical specialist for each category of medical standards. To establish the business necessity defense, it is enough for Akal Security to show that the hearing aid policy was designed through careful consideration by Miller, a physician who was experienced in occupational medicine and who

consulted with an audiologist in creating the USMS hearing standards. (See Final Report 7.) A bald assertion that Miller was unqualified does not, without more, create a genuine issue of fact about the business necessity defense.

Fifth, Fraterrigo cites the hearing standards prescribed by the Municipal Police Training Council, which allow police officer candidates to use hearing aids to meet minimum hearing standards. (See Mun. Police Training Council, Medical & Physical Fitness Standards and Procedures for Police Officer Candidates 7-8 (2003), Ex. N to Fragale Decl.) Akal Security claims that the Municipal Police Training Council standards are inadmissible because they were not disclosed by Fraterrigo in discovery and were not publically available. See Fed. R. Civ. P. 37(c)(1). Regardless of their admissibility, however, the existence of the Municipal Police Training Counsel standards would not affect this Court's ruling. Though the practices of other employers in the law enforcement sector may provide relevant evidence in this action, one set of standards is not enough to create a genuine issue of fact.

Finally, Fraterrigo points to two alleged admissions. First, Fraterrigo offers deposition testimony that Miller gave in another litigation. When asked, "And as we sit here today, you don't know whether or not the no-hearing-aids rule was a business necessity," Miller responded, "Correct." (Dep. of Richard Miller dated Oct. 26, 2005 at 96, Ex. G to Fragale Decl.) Second, Fraterrigo presents a 2001 letter from Akal Security to the USMS in which Akal Security expressed concerns that the new USMS medical standards would disqualify CSOs "for a condition that ha[d] existed for many years and ha[d] not affected performance in any way." (Letter from Daya S. Khalsa, Senior Vice President, Akal Sec., Inc., to John Kraus, Chief, Judicial Sec. Contracts, USMS dated Jan. 22, 2001, Ex. J to Fragale Decl.) Those two statements do not create a genuine issue of fact. The reluctance of Miller—who is a doctor, not

a lawyer—to form a legal opinion on the issue of business necessity does not undercut the substantial evidence Akal Security has offered in support of its hearing aid policy. And the 2001 letter does not, as Fraterrigo contends, show that the hearing aid policy was unreasonable. Even if the line quoted from the letter can be fairly read to address hearing aids, the fact that hearing aids had not posed problems for CSOs in the past cannot, as discussed above, overcome the USMS's legitimate concerns with hearing aids.

Fraterrigo has failed, therefore, to create a genuine issue of fact with respect to Akal Security's "business necessity" defense, and summary judgment is appropriate for Akal Security on Fraterrigo's ADA claims.

C.     Fraterrigo's State Law Claims Also Fail

Summary judgment in favor of Akal Security is also appropriate on Fraterrigo's NYHRL and NYCHRL claims.  New York courts construe the definition of "disability" in the NYHRL more broadly than the definition of "disability" in the ADA, see State Div. of Human Rights v. Xerox Corp., 65 N.Y.2d 213, 480 N.E.2d 695, 491 N.Y.S.2d 106 (1985), and it appears that the definition of "disability" in the NYCHRL is broader than the ADA as well, see N.Y. City Admin. Code § 8-102(16)(a) (defining "disability" as "any physical . . . impairment").  Whether Fraterrigo was disabled for the purposes of his state law claims, however, need not be decided, as the definition of disability is the "sole exception" to the general rule that "disability claims under the NYHRL and NYCHRL are subject to the same analytical framework as claims under the ADA."  Bresloff-Hernandez v. Horn, No. 05 Civ. 0384, 2007 U.S. Dist. LEXIS 71257, at *12 n.4 (S.D.N.Y. Sept. 21, 2007) (citing Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n.1 (2d Cir. 2000)); see also Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 103-104 (2d Cir. 2003).  Because this Court has found, as a matter of law, that the USMS hearing aid policy as applied to Fraterrigo was "job-related," that it was "consistent with business necessity," and that the use of a hearing aid was not a "reasonable accommodation" pursuant to the ADA, summary judgment is also warranted for Akal Security on Fraterrigo's claims pursuant to the NYHRL and the NYCHRL.

## III.     CONCLUSION

Fraterrigo has failed to establish that he was either "disabled" or "regarded as" disabled as defined by the ADA, and Akal Security has

-+demonstrated that the USMS hearing standards and hearing aid policy as applied to Fraterrigo were job-related and consistent with business necessity.  Accordingly, Akal Security's motion

for summary judgment is granted, and Fraterrigo's motion for partial summary judgment is denied. The Clerk of Court is directed to enter judgment for Akal Security.

Dated: New York, New York
      October 29, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.